Argued December 5, 1944; affirmed May 22; rehearing
denied September 11, 1945

PIERCE AUTO FREIGHT LINES, Inc., ET AL. *v.*
FLAGG, Public Utilities Commissioner of Oregon
OREGON-NEVADA-CALIFORNIA
FAST FREIGHT, Inc., *Intervenor-Respondent.*

(159 P. (2d) 162)

[1]

*William P. Ellis,* of Salem, for Pierce Auto Freight Lines, Inc., and Independent Truck Line; *Frank C. Mc-Colloch,* of Portland, for Southern Pacific Company and Pacific Motor Trucking Company; (Alfred A. Hampson, of Portland, on brief for Southern Pacific Company and Pacific Motor Trucking Company; Donald A. Schafer, of Portland, and Charles E. Holbrook, of Portland, on brief for Consolidated Freightways, Inc.; Leonard D. Alley, of Portland, on brief for Bend-Portland Truck Service).

*C. T. Terrill,* of Salem, for Public Utilities Commissioner of Oregon; *Edward M. Berol,* of San Francisco, for Oregon - Nevada - California Fast Freight, Inc.,

(George Neuner, Attorney General of Oregon, Rex Kimmell, Assistant Attorney General of Oregon, and Charles W. Erskine, of Salem, on brief for Public Utilities Commissioner of Oregon; William M. McAllister, of Medford, and Berol & Handler, of San Francisco, on brief for Oregon-Nevada-California Fast Freight, Inc.)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Justices.

Note: Harry H. Belt succeeded J. O. Bailey as Chief Justice January 1, 1945.

## ROSSMAN, J.

This is an appeal by the plaintiffs from a decree of the circuit court which dismissed their complaint. The latter was filed under the provisions of §§ 113-151 and 115-531, O. C. L. A. It challenged orders entered November 5 and December 17, 1942, by the public utilities commissioner. The second order was merely an affirmance, upon rehearing, of the first; hence, when we hereafter speak of "the order" we mean both. The plaintiffs were Pierce Auto Freight Lines, Inc., Consolidated Freightways, Inc., Bend-Portland Truck Service, Inc., Southern Pacific Company, Pacific Motor Trucking Company, all corporations, and Raymond and Earl E. Lininger, partners doing business as Independent Truck Line. The public utilities commissioner was the defendant. The commissioner, at the time of the entry of the orders and the commencement of this suit, was Mr. Ormond R. Bean. June 1, 1943, he was succeeded by the present commissioner, Mr. George H. Flagg. Oregon-Nevada-California Fast Freight, Inc., became intervenor.

The appellants are the above plaintiffs. In the proceeding before the commissioner they were the protestants. The respondents are the defendant and the intervenor. The latter was the applicant for a permit (§ 115-511, O. C. L. A.) before the commissioner.

The issue presented by the pleadings and by the appeal is the validity of the aforementioned order. The appellants contend that it lacked support by substantial evidence and that its entry was not authorized by § 115-511, O. C. L. A. It granted the intervenor a permit to operate as a common carrier of freight on U. S. Highway 99 between Portland and Ashland. A statement of some facts, undisputed by any party to this appeal, will assist in an understanding of the issues.

The Pierce Auto Freight Lines, Inc., and Consolidated Freightways, Inc., hereafter termed Pierce and Consolidated, respectively, possess permits authorized by § § 115-501 to 115-516, O. C. L. A., and pursuant to them, render service as common carriers of freight on Highway 99 between Portland and Medford. Ashland is thirteen miles south of Medford. The distance from Portland to Ashland is 319 miles. Highway 99 parallels the Southern Pacific Company line of railroad between Portland and Ashland. The Southern Pacific Company runs trains between those places, and as a part of its service operates merchandise cars affording substantially the same service and schedules as Pierce and Consolidated. The Pacific Motor Trucking Company is a subsidiary of the Southern Pacific Company. The principal function which it renders is a pickup and delivery service for the Southern Pacific's merchandise cars. Bend-Portland Truck Service, Inc., is immaterial to any issue presented by the appeal. The aforementioned partnership, which does business under

the names of Independent Truck Line, operates two common carrier trucks between Ashland and Medford. It interchanges freight with Pierce and Consolidated. The latter two deliver nothing directly to consignees in Ashland. Freight from the north for Ashland is turned over to Independent at Medford and is distributed by it to the consignees. Likewise it picks up freight in Ashland for points north and turns it over in Medford to Pierce and Consolidated. Pierce, besides its schedules between Portland and Medford, also operates into San Francisco. Consolidated affords truck service as a common carrier in all of the territory west of Chicago.

Oregon-Nevada-California Fast Freight, Inc., the intervenor, which will hereafter be termed O. N. C., is engaged as a common carrier in the transportation of property by motor truck. Prior to the entry of the attacked order it operated schedules between (1) San Francisco and points in Nevada; (2) San Francisco and Klamath Falls; (3) San Francisco and Medford; (4) Klamath Falls and Medford; and (5) Portland and Medford through the Coos Bay cities. The following is an explanation of the schedules last mentioned. Trucks operate under it from Portland along Highway 99 to Drain; from Drain to Reedsport on Highway 38; from Reedsport to Coquille on Highway 101; from Coquille to Dillard on Highway 42; and at Dillard return to Highway 99 and continue on to the southern terminus of the schedule at Medford. As an incident to the Coos Bay service they operate between Drain and Dillard. The permit under which that schedule was authorized denies to O. N. C. the right to receive any shipment along Highway 99 for delivery to any point on Highway 99. Thus, O. N. C. cannot accept

any traffic in Portland, Salem or any other point on Highway 99 for delivery in Eugene, Roseburg, Grants Pass or Medford. It can, however, accept goods at any of the points last mentioned for delivery in Reedsport, Coos Bay or Coquille because those points are not on Highway 99. Likewise it can accept a shipment at any of the three cities just mentioned for delivery in Medford, Grants Pass or Portland.

At the time of the entry of the attacked order, O. N. C. was bringing north from San Francisco to Medford a greater tonnage than any other carrier. The volume averaged 80 tons per day. But since it possessed no permit authorizing it to run north from Medford directly into Portland along Highway 99, it was compelled to turn over the tonnage at Medford to other carriers which took it north. At the time of the hearings, which we shall shortly describe, O. N. C. and a carrier, entitled Oregon Express Company, had an agreement under which Oregon Express accepted at Medford and hauled to Portland about 70 tons per day of the lading which O. N. C. brought to Medford. Oregon Express possessed a permit for operation on Highway 99 between Portland and Medford, but lacked sufficient equipment to enable it to render the service. Pursuant to the contract just mentioned, O. N. C. leased to Oregon Express whatever equipment was needed and with it Oregon Express proceeded to Portland with the tonnage which O. N. C. had delivered to it. In Portland the empty trucks were returned to O. N. C. which drove them back to Medford. O. N. C., in addition to the lading which it delivered to Oregon Express at Medford, turned over additional quantities to Pierce, Consolidated and Pacific Motor Trucking Company. For instance, in 1941, it delivered to Pierce

in Medford 2,610,981 pounds for transportation to points north of Grants Pass.

The application filed with the public utilities commissioner which resulted in the two aforementioned orders, and which ultimately yielded the decree under attack, sought a permit enabling O. N. C. to operate between Portland and Ashland on Highway 99. O. N. C. was the applicant and all of the parties-plaintiff in this suit were protestants. The orders aforementioned were entered at the end of the hearing and authorized O. N. C. to maintain daily three schedules south from Portland to Ashland and two north from Ashland to Portland. Its rates will be the same as those of other carriers. In other words, competition, in the event the orders were sustained, will not be based upon rates.

Although the application which resulted in the order under attack is not before us, it apparently was filed in 1940. The appellants' brief states that in it O. N. C. sought, not only a permit for service between Portland and Medford, but also the permit under which it instituted the Coos Bay service. The order which authorized the latter denied the other parts of the application; that is, a permit for service along Highway 99 between Portland and Medford. The Coos Bay service was instituted March 10, 1941, and the permit which authorized it is not under attack. We shall have occasion to mention that service again, but wish to make it clear that the permit under which it is rendered is not in issue. October 21, 1941, the application for service along Highway 99 between Portland and Medford, was renewed, but in modified form. The amended application extended the southern terminus from Medford to Ashland and excluded all local service between Portland and Cottage Grove. It restricted service on

Highway 99W to an "on call" basis and to shipments weighing 5,000 pounds or more.

January 6, 1942, the commissioner began a hearing upon the modified application. All parties to the present appeal participated. It closed February 28, 1942. The testimony taken in the course of the hearing has been transcribed and constitutes 2,107 typewritten pages. Fifty or more documents were received in evidence as exhibits.

November 5, 1942, the application in its amended form was granted, but a modification, immaterial to present purposes, was made concerning the proposed service on Highway 99W. The order of November 5 did not become effective until November 20. In the nine months which passed from the commencement of the hearing (January 6, 1942) to the effective date of the order (November 20) freight movements underwent a change due to war conditions. November 19 the protestants (plaintiffs in this suit) petitioned for a rehearing. The petition was allowed and December 4, 1942, the rehearing commenced. It terminated December 17, 1942. The testimony taken upon the rehearing, as transcribed, covers 290 typewritten pages. Thirty-seven documents were offered as exhibits. At the conclusion of the rehearing the order of November 20 was affirmed. O. N. C. promptly instituted the authorized service; that is, between Portland and Ashland.

February 6, 1943, the complaint was filed which eventually culminated in the decree now under attack. After averring the facts which we have already set forth, the complaint charged that the orders of November 20 and December 17 "were and are arbitrary, unreasonable, unlawful and void, * * * for each of the

following reasons:" (1) the commissioner "rejected and refused to consider competent, relevant and material evidence offered by plaintiffs; (2) the findings "are unsupported by any competent evidence"; (3) the Commissioner's order is "not supported by the findings"; (4) the order is based "upon an erroneous conception of the law"; (5) the Commissioner failed to find, and upon the record could not have found, that the transportation services rendered by the plaintiffs "was in any respect inadequate or insufficient"; (6) "the conclusion and order are premised upon the unsound and fallacious opinion that because present keen competition has resulted in exceptional service, more competition would or might improve the service * * * whereas it is conclusively established on this record that a further division of traffic would lessen and impair the service"; (7) "the conclusion and order are erroneously premised upon emergency and temporary conditions resulting from the present war, in utter disregard of conclusive and unrefuted evidence concerning normal traffic"; (8) the commissioner acted "upon the unsound and erroneous premise that it is within the province of the commissioner to determine what is or is not contrary to the public interest, without regard to or consideration of the declaration of policy contained in the Motor Carrier Act"; (9) the commissioner acted under a belief that it was within his province "to disregard the provisions of the Motor Transportation Act relating to the impairment of the ability of existing carriers to continue to adequately serve the public if, in his opinion, the public benefits believed probable outweigh in importance the loss to the carrier"; and (10) the grant of a permit to O. N. C. will "impair the ability of plaintiffs and other carriers to continue to adequately serve the public, result in ir-

reparable losses to them through diversion of traffic and otherwise and in the confiscation of their property without due process of law.'' Both the commissioner and the intervenor, O. N. C., filed answers. Each denied all of the averments which attacked the validity of the orders. The trial resulted in the decree aforementioned; that is, in the dismissal of the suit.

Upon this appeal the defendants contend that the circuit court erred when it refused to hold that (1) the commissioner, in entering the orders aforementioned, misconstrued the Motor Transportation Act (§§ 115-501 to 115-537, O. C. L. A.), especially the term ''the public interest'' which appears in § 115-511, subd. (c); (2) ''under the Motor Transportation Act existing carriers are entitled, as a matter of right, to transport all the traffic which they can handle adequately, economically and efficiently without the competition of new motor-carrier service''; (3) the grant of the permit to O. N. C. will impair the ability of the appellants, especially Independent Truck Line, to render their service; (4) the commissioner, in determining the question as to the impairment of existing carriers, failed to consider evidence showing revenue during normal conditions and acted wholly upon evidence showing conditions in the abnormal wartime period; and (5) the refusal of the commissioner to receive and consider competent, relevant and material evidence offered by the appellants denied to them a full and fair hearing and rendered his findings and order void.

The following map may be helpful to an understanding of the facts which we have mentioned and to which we will advert many times.

By glancing at the map and recalling the facts which we have narrated, it will be seen that before the challenged order was made O. N. C. possessed a permit

authorizing it to render service between Portland and Medford through the Coos Bay cities. It could not, however, accept anything in Medford for transportation to Portland because both of those points are on Highway 99. Before the entry of the challenged order it also operated a schedule between Klamath Falls and Medford. Likewise before the entry of the order tonnage brought by O. N. C. from California to Medford was hauled north from Medford to Portland in equipment owned by O.N.C., but operated by Oregon Express which, for the purpose of each trip, acted as lessee of the equipment. The empty trucks were returned south by O. N. C. The attacked order authorized O. N. C. to operate schedules between Portland and Ashland on Highway 99 and thus handle its own traffic.

Before giving a further narrative of the facts, we shall take note of the applicable statutes. Section 115-504, O. C. L. A., says:

"The business of operating as a motor carrier of persons or property for hire upon the highways of this state is declared to be a business affected with the public interest, and that it is contrary to public policy and public interest that monopoly or monopolistic practices in motor transportation be permitted. The rapid increase of motor carrier traffic, and the fact that under existing law many motor trucks, trailers and busses are not effectively regulated, have increased the dangers and hazards on public highways and make it imperative that more stringent regulations should be employed, to the end that the highways may be rendered safer for the use of the general public; that the wear of such highways may be reduced; that minimum of inconvenience to other users of the highways may be effected; that minimum hindrance and stoppage to other users of the highways compatible with the needs of the public for adequate transportation

service may be effected; that the highways may be safeguarded from improper or unnecessary usage; that operation by irresponsible persons or any other operation threatening the safety of the public or detrimental to the general welfare be prevented; that discrimination in rates charged may be eliminated; that congestion of traffic on the highways may be minimized; that the various transportation agencies of the state may be adjusted and correlated so that public highways may serve the best interest of the general public; that it is necessary that statutes be passed to provide a method of assessing privilege taxes to enable the further construction of highways and to provide for the operation, preservation and maintenance of highways already built, and the legislature hereby declares that to effect the foregoing ends and purposes this statute is adopted; provided, however, that nothing in this act shall be construed as requiring or authorizing a compliance with, or an application of, any law or rule with respect to a certificate of public convenience and necessity as a condition to the granting of any permit authorized by this act.

The pertinent parts of § 115-511, O. C. L. A., which is the only other statute bearing directly upon the issues before us, are the following:

"The issuance of permits to common carriers who do not now own and hold permits as motor carriers under existing law shall, except as hereinafter provided, be made only after hearing had and showing made as required by the following subdivision 2 of this section 115-511.

"(2) Upon the filing with him of application for permit to operate as a common carrier, * * * the commissioner shall investigate the application and if the proposed operation is competitive with existing carriers and/or there is protest against the granting of permit, shall fix a time and place for a hearing thereon. The commissioner shall cause notice of such hearing to be served * * *.

"If the commissioner finds from the record and the evidence that:

"(a) The applicant, if an intrastate operator, is financially responsible and adequately equipped to perform the service proposed;

"(b) That the equipment listed is safe for operation;

"(c) That the operation proposed is not contrary to the public interest;

"(d) That the service proposed will not be attended with substantial damage to the highways or danger to other users thereof or to the public;

"(e) That the granting of a permit will not result in the impairment of the ability of existing operators to adequately serve the public;

"(f) That the applicant, if an intrastate operator, can and will file passenger insurance as provided in this act;

"(g) That the rates, schedules and/or contracts proposed by the applicant, if an intrastate operator, are approved by the commissioner;

"(h) That the applicant can and will file liability and property damage bond or suitable insurance policy as provided in this act; then the commissioner, upon compliance by the applicant with the law and the rules and regulations of the commissioner, shall issue a permit but unless said findings are so made by the commissioner the application shall be denied or * * *;

"(i) * * *

"(j) * * *."

No one contends that the commissioner failed to comply with paragraph 2 of § 115-511 above quoted. The appellants present no issues concerning sub-paragraphs a, b, f, g, h, i, and j. Thus, the issues placed before us by the appellants are that the evidence fails to show (1) "the operation proposed is not contrary

to the public interest''; (2) the operation ''will not be attended with damage to the highways or danger to other users''; and (3) the operation ''will not result in the impairment of the ability of existing operators to adequately serve the public.''

The findings entered by the commissioner state:

''Applicant is financially responsible to perform the service proposed. * * * Applicant is adequately equipped to perform the service proposed. The equipment listed on applicant's present permit has been inspected by officers of the Oregon State Police and is safe for operation. * * * Applicant is presently authorized to operate equipment over the routes requested by the instant application and certain limited service is being performed over these routes. Therefore the question is whether the additional schedules required to perform the service requested herein will result in or be attended with substantial damage to the highways or danger to other users thereof or to the public. Upon consideration of all the evidence of record it is found that the service proposed will not be attended with substantial damages to the highways or danger to other users thereof or to the public.''

Those findings are supported by substantial, competent, cogent evidence, and, that being true, we shall mention those matters no further.

The schedules proposed by the application and authorized by the permit call for three southbound and two northbound operations. In the handling of the southbound schedules, O. N. C. planned to use, in part at least, the empty equipment returned to it daily in Portland by Oregon Express. Two of the southbound schedules call for equipment to leave Portland daily except Sundays and holidays at 6:30 p. m. One of them arrives in Ashland at 7:15 the next morning

and the other at 9:00. The faster schedule, unlike the slower, renders service to the larger centers only. The third southbound schedule calls for daylight service between Portland and Ashland every day of the week. Under it equipment leaves Portland at 6:30 a. m. and reaches Ashland at 9:00 p. m. One of the two northbound schedules provides for equipment to leave Ashland daily except Sundays and holidays at 5:00 p. m. and arrive in Portland at 7:10 a. m. The other specifies a departure from Ashland at 6:30 p. m. and arrival in Portland at 6:30 a. m., likewise with the exception of Sundays and holidays. One of the two northbound schedules would connect at Drain with the northbound Coos Bay truck and run from there into Portland as a single piece of equipment.

Consolidated affords only a single schedule into Southern Oregon. It departs from Portland at 6:00 p. m. and is due to arrive at Medford at 7:00 a. m. Northbound Consolidated's schedule leaves Medford at 6:00 p. m. and arrives in Portland at 8:00 a. m.

Pierce handles a sufficiently large volume of tonnage so that it affords specialized service. It is the pioneer carrier in the field. A. C. Pierce, who in 1931 procured incorporation for the company that bears his name, began operations between Portland and Medford in 1924. Pierce's equipment is scheduled to leave Portland southbound at 6:30 p. m. and reach Medford at 6:50 a. m. Under that schedule one piece of equipment runs through to Eugene, another through to Roseburg, another to Grants Pass, and so forth. Northbound Pierce leaves Medford at 5:00 p. m. and arrives in Portland at 7:00 a. m. In addition, Pierce maintains several local daylight schedules in the area between Portland and Medford. For instance, it maintains a

daylight schedule between Portland and Eugene; another between Eugene and Yoncalla, and so forth; but it has no daylight schedule all the way through between Portland and Medford.

Far more goods move south between Portland and Medford than north. The quantities are: about 100 tons of less than truckload traffic move south daily, and only 30 tons move north. The unbalanced character of the movement operates adversely upon the earnings of carriers. The fact that Southern Oregon fails to provide sufficient tonnage for the northbound equipment caused Pierce to institute, in 1935, a schedule into San Francisco. Since then Pierce has had a better balanced lading.

The equipment of both Pierce and Consolidated in intrastate business goes no farther south than Medford. Lading for Ashland is delivered to consignees, as already explained, by Independent. If the southbound equipment reaches Medford too late to connect with Independent's Medford-Ashland service, the goods lay over in Medford and are not delivered in Ashland until the following day. One-day delays frequently occur and several witnesses from Ashland voiced complaints on account of that fact.

The Southern Pacific and its subsidiary, Pacific Motor Trucking Company, which we shall hereafter identify by its trade name, P. M. T., afford over-night service between Portland and Ashland. The main feature of this service is rendered by merchandise cars which are attached to the Southern Pacific's Rogue River Express, both southbound and northbound. The southbound train leaves Portland at 7:45 p. m. and reaches Medford at 7:55 the following morning. Two or more of the merchandise cars are destined for

Eugene, one for Grants Pass and another for Medford. P. M. T. trucks pick up the freight for the cars and other trucks distribute the contents after the cars have been set out at the above-named destinations. When the northbound train reaches Portland P. M. T. makes deliveries in that city.

Prior to July 1, 1940, P. M. T. was locally owned, and under local ownership was in competition with Pierce, Consolidated and Southern Pacific. Upon the date last mentioned P. M. T. passed into the ownership of Southern Pacific and thereupon assumed as its principal function the shuttle service for the merchandise cars which we have already described. It coordinates its efforts with those of the Southern Pacific. Prior to 1937 another carrier, Farnum Truck Line, provided service along Highway 99 between Portland and Medford, but in 1937 abandoned the field. Before the war steamship lines in coastal service brought cargo into Portland and to that extent competed with the other carriers. Under wartime conditions the coastal service has been discontinued.

The Railway Express Agency, in conjunction with the Southern Pacific, affords service into the territory with which we are concerned. That carrier participated in the hearing before the commissioner, but was not a party to the suit under review.

Oregon Express has developed a small volume of tonnage in Portland for movement south and hauls it in some of the equipment which it leased from O. N. C. for the Medford to Portland run. But the volume is so small that only a minor part of the equipment which ran north from Medford is required for the movement south. The other trucks are returned to O. N. C. in Portland empty, and are run south by that carrier.

Officials of O. N. C. estimate that O. N. C., upon entering the field, will secure approximately 25 per cent of the available southbound tonnage. They plan to haul most of it in the equipment which Oregon Express daily returns to O. N. C. in Portland. They hope to obtain 6½ tons of the 30 tons which move northward daily from Medford.

The above is a sufficient description of the transportation facilities between Portland and Ashland along Highway 99.

It will be observed from a comparison of the schedules which the commissioner authorized O. N. C. to inaugurate and those already under operation by Pierce and Consolidated that the improvements proposed by O. N. C. are two in number: (1) O. N. C. will afford direct service into Ashland; and (2) O. N. C. will provide a daylight schedule all the way through from Portland to Ashland.

A hundred or so shippers and consignees along the route from Portland to Ashland testified before the commissioner. All except a few of them manifested satisfaction with the service rendered by Pierce, Consolidated, P. M. T., Railway Express Agency and the Southern Pacific. In expressing their satisfaction, some of the witnesses employed such terms as "O. K.", "very good", "very adequate", "very satisfactory", "100% service", "absolutely adequate", "can't be beat", "perfectly satisfactory", "I couldn't ask for anything better", "very good service all the way through", "very much pleased with the service", "all that could be asked of any freight lines" and "they have leaned over backward to give us good service". Some of these witnesses expressly opposed the application made by O. N. C. Virtually all of this group, how-

ever, swore that O. N. C.'s Coos Bay schedule was very satisfactory. The reasons for their opposition to O. N. C. were various. Succinctly stated, they are: (a) the present carriers are sufficient in number; (b) the present service is excellent and adequate; (c) a fear that rates will be raised or service deteriorate if the available business is divided among too many carriers; (d) loading docks in many instances are already taxed to capacity and the visits of the pickup trucks of an additional carrier will make matters worse; and (e) the section of Highway 99 between Grants Pass and Canyonville will be rendered more dangerous if additional trucks operate over it.

The witnesses who supported the application of O. N. C. submitted many reasons for their endorsement. Some of them who are engaged in business in Ashland complained that shipments consigned to them occasionally lay over in Medford for a day due to the fact that Pierce or Consolidated failed to make connection with the Medford-Ashland service. Three or four, who possibly were ignorant of the Southern Pacific merchandise cars, swore that that carrier was slow in transporting freight. Some (few in number) had had unsatisfactory experiences with Pierce or Consolidated in the settlement of claims or in having their shipments picked up at the required time. Two witnesses believed that O. N. C. refrigeration service was superior to that afforded by Pierce and Consolidated. Many declared that the services of all existing carriers would be improved by the entry of another in the field. They wanted more competition. O. N. C. was described as an excellent carrier. Even its competitors termed it "the highly aggressive firm" or "an aggressive company well established". Some of these witnesses testi-

fied that after O. N. C. began its Coos Bay schedule, in competition with Consolidated and Southern Pacific, the service into that area was materially improved, and argued that O. N. C.'s entry into the Portland-Medford run would improve conditions along that route. An occasional witness believed that the present carriers have all the business they can handle. A chair manufacturer located in Albany swore that the truck lines were so loath to haul his product that he was forced to ship his goods by Southern Pacific's freight cars and that "now they can't even pick up a car before two days." Referring to the truck lines, he said: "The furniture follows along when there is an available truck." A witness who operated a meat packing plant in Albany expressed a desire for "better service into Southern Oregon than we are getting at the present time." He added: "We have quite a competition from California, particularly in Klamath Falls, Medford and Grants Pass. An occasion arises once in a while where a man will want ten or twenty barrels of lard * * *." He swore that on such occasions he was required to give the carrier advance notice. We quote further from his examination:

"Q. Have you ever had shipments passed up at Albany destined to Southern Oregon territory?

"A. Maybe from one truck to the other or one train to the other. I had a shipment left on the platform the other morning for the simple reason they couldn't carry it."

This witness believed that O. N. C.'s daylight schedule would be useful in his business and buttressed his opinion with resort to an instance that had occurred recently. A shipper of steel, which ran to lengths of twenty to thirty feet, swore that Consolidated refused his shipments and that he met with delay from other

carriers. O. N. C., according to him, possessed the needed equipment and handled his shipments into Coos Bay in a satisfactory manner. Several were firm in the belief that in the area between Portland and Southern Oregon there was need for more than two truck carriers. They dwelt upon the fact that there operates from California into Southern Oregon eight truck lines, and declared that the latter afford better service for California shippers into Southern Oregon than is possessed by Portland shippers. These witnesses urged that shippers and consignees between Portland and Medford were entitled to a greater range of choice than three in selecting carriers and types of service. One of them said: "I feel that I should have more of a choice." Another, who was the traffic manager of a concern which shipped from Portland into Southern Oregon fifteen to twenty tons per month, said that O. N. C.'s entry into the area would "give us a better chance to distribute our freight as we saw fit." Referring to the competition from San Francisco, he testified: "It (O. N. C.'s proposed service) would possibly help us meet our competition in a better way." He also said that O. N. C.'s proposed daylight schedule would be useful to him. Several others declared that O. N. C.'s daylight service between Portland and Ashland would be of value to them and that they would use it. The head of a traffic association testified that the present carriers are not sufficiently competitive among themselves. The manager of another association said: "I believe there is a necessity for additional service into Southern Oregon to protect Portland and the Northwest, including Seattle business versus California." Another testified: "The competition from the south is decidedly much keener than it is from the north." The evidence indicates that the volume of business between

Portland and Ashland has materially increased for some time. Some witnesses feared that the existing carriers would not be able to handle the available business.

The appellants' witnesses swore that truck transportation between Portland and Medford compared favorably with similar services between Portland and other parts of the Northwest. A. C. Pierce, president of Pierce Auto Freight Lines, claimed that the service rendered by his company between Portland and Medford was superior to that of any California carrier into Southern Oregon.

The appellants contend that the tonnage for delivery in Ashland is too small to justify the operation of O. N. C.'s line-haul equipment into that city. We observe that O. N. C. does not plan to send its line-haul equipment into Ashland when the lading is small. As already indicated, Independent Truck Line transports all of Pierce's and Consolidated's lading between Medford and Ashland. It employs two six-ton trucks which afford two daily schedules between the two cities. Its assets are $3,553.62. In the illustrative months of May and October, 1941, Independent exchanged with connecting carriers 195,069 and 193,594 pounds, respectively. Its operating revenues in 1941 were $5,742.98. It earned for its two partners a net revenue of $2,890.45 in 1941. The partners operate the business as a part-time venture. The one who testified swore that if O. N. C.'s entry into the field diverted much business from Independent, it would be compelled to withdraw one truck from the service and that the latter would thereby deteriorate.

The appellants also contend that O. N. C.'s proposed daylight schedule would meet with very little patronage

owing to the fact that it would depart from Portland at an early hour. However, as already indicated, many shippers testified that the schedule would be useful to them and that they would patronize it.

We come now to the earnings of the existing carriers. The Southern Pacific and P. M. T. offered no data concerning gross or net revenue. We have already reviewed the figures presented by the Independent Truck Line. Consolidated combined the earnings of the Coos Bay line with 'those of the Portland-Medford service and failed to segregate full-truck movements and empty-truck movements. It is impossible to determine accurately what Consolidated earned in intrastate business upon the Portland-Medford route.

Pierce submitted extensive figures. Its balance sheet of December 31, 1941, shows that it possessed assets totaling $167,105.13. The largest item that entered into that total was tangible property. It aggregated a depreciated value of $98,119.54 and was arrived at in the following manner:

Carrier operating property ........$179,126.48
Less: Reserve for depreciation .. 81,006.94

Total tangible property ..............$ 98,119.54

The only other sizeable item listed under this head consists of current assets in the amount of $55,033.98 comprised of cash, supplies, working funds and accounts receivable.

Pierce's capital stock is made up thus:

Preferred stock ..............................$ 4,400.00
Common stock .................................. 39,300.00
Capital stock subscribed ............. 100.00

Total ................................................$ 43,800.00

Its balance sheet of December 31, 1941, enters as earned surplus $22,161.04.

In 1941 Pierce's revenue was $424,810.67 and its expenses were $388,889.55. The latter included $19,341.29 depreciation. Hence, its 1941 net operating revenue was $35,921.55. From that sum Pierce's accountant, in order to get net income, deducted interest paid in the sum of $3,216.18, and income taxes in the amount of $13,770.41. Having made the deductions, the accountant showed that Pierce's 1941 net income was $18,-934.96. In other words, in 1941, Pierce earned 43 per cent upon the capital invested in the business. If provision for income tax is ignored, but interest is deducted, Pierce's 1941 net income would constitute a return of 75 per cent upon the invested capital. The percentage will be reduced, of course, if earned surplus is considered, but we employed the method pursued in the briefs.

Pierce's accountant, as a witness, recited figures showing the earnings of Pierce since 1931 upon its fixed capital assets. By the use of that term we think he meant Pierce's total assets which, as already indicated, amounted to $167,105.13 in 1941. According to the accountant, Pierce's 1941 net earnings constituted a return of 19.30% on its fixed capital assets. For the 11-year period of time beginning with 1931 and ending with 1941, this witness gave the following percentages for Pierce's return on its fixed capital assets:

| Year | Per Cent |
|------|----------|
| 1931 | 9 |
| 1932 | 10 |
| 1933 | 12.02 |

| 1934 | deficit | 15.59 |
| 1935 | | 17.20 |
| 1936 | deficit 53/100 of 1% | |
| 1937 | deficit | 16.15 |
| 1938 | | 7.49 |
| 1939 | | 11.22 |
| 1940 | | 9.14 |
| 1941 | | 19.30 |

In contrast to the return based upon fixed capital assets, we have the figure of 75% which expresses the return in 1941 upon the invested capital. The average return on fixed capital assets for the 11-year period was 5.74%.

This witness was familiar with Pierce's dividends for only a five-year period. He swore that in the five years Pierce paid dividends on its preferred stock, but on its common stock only in 1940 and 1941. In 1940 the return was 6% and in 1941 21%.

Pierce's officials testified that it would lose more business than any other carrier if O. N. C. entered the field. They explained that Consolidated obtained its business on a nation-wide basis and that shippers who preferred rail service would not be diverted from the Southern Pacific by the entry of O. N. C. These witnesses thought that Pierce would lose from 25% to 35% of its business to O. N. C. Pierce's accountant prepared a statement based upon its 1941 operating revenue in which he sought to prognosticate the effect upon Pierce's net income if it lost 10, 15, 20, 25, 30 or 35 per cent of its business. Pierce's 1941 operating revenue was $424,810.67. Its total expenses were $388,889.12, leaving a net operating revenue before deductions for interest and income taxes of $35,921.55. This witness

estimated that if Pierce had lost in 1941 10 per cent of its business, its operating expenses would have been $359,849.43, and its net operating revenue $22,480.72. The witness thought that the latter sum would be reduced to about $10,000 after there had been deducted from it $3,000 interest charges and also the income taxes. A return of $22,480.17 would be a yield of more than 50 per cent upon $43,700 (invested capital). A return of $10,000 would be approximately 23 per cent upon $43,700. The same witness estimated that if Pierce had lost 20 per cent of its tonnage in 1941 its net operating revenue before deduction of interest and income taxes would have been $9,038.81. He estimated that if it had lost 35 per cent of its tonnage, 1941 would have incurred a deficit of $11,123.23. All of those figures were based upon 1941 tonnage. The evidence indicates that the volume of tonnage in 1942 substantially increased. A. C. Pierce, president of the appellant that bears his name, swore at the time of the original hearing (February 1, 1942) that the volume of business in 1942 would be materially less than in 1941; but when he testified in December, 1942, upon rehearing, he conceded that 1942 tonnage had materially increased—some months were 50 per cent ahead of corresponding months in 1941. O. N. C. officials estimated that that carrier would not lessen the volume of the other carriers, but would get its business largely out of the increased flow of tonnage.

A Southern Pacific accountant presented data which showed the gross revenue received by every Southern Pacific station located between Portland and the California line and the expenses incurred in the maintenance of each. In computing revenue he excluded everything except the tariff paid for less than carload lots,

and in calculating expenses he ignored such items as taxes, repairs and depreciation. His figures showed that the station in Canby yielded only $4.00 above expenses in 1940, and that several, including Tangent, Halsey, Oakland and Junction City, exceeded expenses by narrow margins. According to Southern Pacific officials, a station which performs no function except service to shippers must earn expenses or suffer closure. When a station is closed the community is deprived of telegraph, railway express and train information services. These witnesses expressed the belief that if a permit were granted to O. N. C. and if the competition of that carrier deprived Southern Pacific of traffic, it might be necessary to close several stations. They called attention to restrictions imposed upon railways by the federal Office of Defense Transportation which deny them the privilege of moving a car unless it contains eight tons of lading or is loaded to visible capacity, and swore that since the order went into effect the Southern Pacific was compelled on several occasions to forego its merchandise car for Medford, due to lack of sufficient tonnage. No witness made an effort to foretell the effect upon Southern Pacific tonnage if O. N. C. became a competitor except those who testified in behalf of Pierce. As already indicated, they believed that O. N. C.'s entry upon the route would have little effect upon the Southern Pacific.

We have already quoted a part of the commissioner's findings. The following are taken from the same source:

"No appreciable increase in overhead expense, terminal expense or other extraordinary capital outlays will be necessary to institute the proposed service.

\* \* \*

"Applicant leases to Oregon Express between 5 and 7 pieces of equipment daily. Lessee operates these vehicles between Medford and Portland. If necessary, part of this equipment could be used by Applicant for the service here proposed, especially from Portland to Ashland.

\* \* \*

"For a new operator entering the field with equal rates and charges to cause any appreciable diversion of traffic from existing operators to itself would be because of a more satisfactory service offered by such new operator or by such new competition tend to improve the entire service.

\* \* \*

"After having considered all evidence of record it is the opinion of the Commissioner that the operation proposed by the Applicant as herein authorized is not contrary to the public interest.

\* \* \*

"Consolidated's other contention that the expected diversion and the consequent loss of revenue would result in and necessitate a curtailment of service is neither persuasive nor based upon accurate evidence. The evidence presented cannot be accorded sufficient weight to justify any other determination than that herein obtained. The additional competition to be provided by Applicant is a competition of service only.

\* \* \*

"The evidence presented by S. P. and P. T. X. and that of Railway Express Agency, Inc., is not persuasive and it cannot be concluded that the granting of this application would result in the abandonment of such agency stations."

After the findings had reviewed Pierce's revenues, expenses, assets and volume of business, they analyzed the probable effect upon Pierce of the entry by O. N. C. into the territory. In so doing the findings indulged in

the assumption that O. N. C. would divert daily from the present carriers 31½ tons of traffic (25 southbound and 6½ northbound) and that 50 per cent of it would be taken from Pierce. The revenue produced by 31½ tons is $50,626.34. We now return to the findings:

"Based upon a diversion of $50,626.00, Pierce would earn more than a reasonable and fair return on its property investment. The diversion of traffic will not be sufficiently substantial to materially affect the ability of Pierce to render reasonably adequate service and facilities to the public.

\* \* \*

"The present service now being provided to shippers and consignees of freight at Ashland is not adequate.

\* \* \*

"The granting of this application in part and issuance of permit as hereinafter set forth will not result in the impairment of the ability of existing operators to adequately serve the public."

After the entry of his findings, the commissioner, as previously stated, granted a rehearing. We have already mentioned two facts developed upon the rehearing—the increased volume of business available in 1942 and the order of the Office of Defense Transportation which prevented the movement of a railway car unless its load met minimum requirements. In the course of the rehearing, which got under way twelve months after Pearl Harbor, the protestants urged that it was against the public interest for any carrier to institute a new service. Specifically, they insisted that new runs and schedules unnecessarily consume tires and make unwarranted demands upon the limited quantity of available motor equipment. In the course of the rehearing officials of O. N.C. swore that, although they had offered to other carriers which were operating

between Portland and Medford the use of O. N. C.'s empty southbound equipment, most of the trucks continued to run empty. Representatives of other carriers, as witnesses, indicated a willingness to use some of O. N. C.'s southbound equipment, but O. N. C. officials swore that all of these offers required the empty equipment to lie idle in Portland for many hours, and that there was no assurance that the other carriers would regularly provide loads. We observe that the president of one of the other carriers testified: "We couldn't use all of their equipment by any means."

O. N. C.'s officials explained that it would be necessary to provide very little additional equipment to conduct the proposed operations and that O. N. C. owned all of the necessary equipment. They also testified that, although the new schedules would increase O. N. C.'s mileage approximately 300 per day, O. N. C. would thereby make full use of the empty equipment.

We have already mentioned the fact that the head of Pierce Auto Freight Lines testified that 1942 brought to his concern much more business than 1941. On behalf of the Southern Pacific it was stated, upon rehearing: "There has been in our traffic an increase of about 33 1/3%."

The principal development upon the rehearing was the production by the protestants (appellants) of 37 documents which they offered in evidence. Two of these, which contained data concerning Southern Pacific's merchandise cars, were received in evidence, and, as appellants' brief states, they "are not here in issue." Four of the 37 documents were copies of orders made by the commissioner in other proceedings. They were offered to show how he construed the Motor Transportation Act when passing upon applications made

by others. They were not received in evidence. The other 31 documents had their origin in the Office of Defense Transportation or with the War Production Board. Some of them were press releases; some were statements of policy; some were rulings by the Office of Defense Transportation; some were addresses by officials of the Office of Defense Transportation; and some were regulations promulgated by the above-mentioned agencies. Document 3, which is illustrative of 1 and 2, was a pamphlet entitled "Office of Defense Transportation * * * Instructions for Preparing Application for Certificate of War Necessity." Documents 4, 5, 6, 7 and 8 emanated from the War Production Board and ordered manufacturers of trucks and similar equipment to cease operations unless favored by exceptions stated in the orders. Document 9 was a press release in which one of the officers of the Office of Defense Transportation reviewed the manpower shortage among motormen, bus operators, truck drivers and automotive mechanics. Document 10 developed the manner in which " 'skip-stops' also called 'Victory-stops' " save rubber and gasoline for buses and streetcars. Unfortunately, the compiler of this highly informative document failed to take note of the waste of good paper and ink resulting from his efforts. Document 11 was a release pertaining to labor shortages in the for-hire trucking industry. Document 12 outlined a means whereby, for a temporary period, commercial vehicle operators who had not received certificates of war necessity could obtain them from local ration boards. Document 13 was a newspaper release applicable to school buses. Document 14 consisted of excerpts from an address made by an official of the Office of Defense Transportation pertaining to streetcars and buses. Documents 15 and 16 were both

admitted. The only reason we can conceive for their admission is that they were so manifestly immaterial that it was supposed no prejudice could be claimed by admitting them. Document 15 pertained to Greyhound lines in Florida and other places thousands of miles away, and 16 prevented a New York operator from operating "a taxicab to any point or points more than five miles beyond the corporate limits of New York." Document 17 was an account of a discussion which occurred "yesterday at the first of a series of monthly meetings" concerned with the manpower shortage in the for-hire motor transport industry. Document 18 was a copy of an order of the Office of Defense Transportation which authorized a coordinated operation of passenger carriers by "Peoria-Rockford Bus Company and Alfred E. Bramucci." Document 19 was a release, the opening words of which are: "Advice to Christmas Shoppers from the Office of Defense Transportation. Carry Your Packages Home With You." Document 20 was an order of the Office of Defense Transportation which required the regular inspection of tires of commercial vehicles. Document 21 was a supplementary order of the Office of Defense Transportation pertaining to motor truck operations in Florida. We shall omit specific description of documents 22 to 37 inclusive. They are similar to those which we have already described. Only documents 15, 16, 18 and 20 were received in evidence by the commissioner.

When the offer of documents 1, 2 and 3 was pending for a ruling, counsel for the Southern Pacific said:

"As far as I am concerned, and I am sure I am correct in speaking for Mr. Ellis (counsel for Pierce) in the same regard, the purpose of offering this evidence is not to show that it would prohibit or necessarily prohibit the operation or extension

proposed by this applicant. * * * But the purpose for which this evidence is principally offered and for which certainly I intend to offer my evidence of the same character is to show what the public interest as of this date is contrasted with the public interest as it appeared last February, only a month, a couple of months or so after the declaration of war. * * * If in the light of the conditions which they declare presently exist, if in the light of their assertions as to what the public interest is you can find on this rehearing that there is nothing which the applicant is proposing which is inconsistent with public interest, then you, I take it, will stand by your order, * * *."

Later, when rulings were pending upon more of the documents, counsel stated:

"I say the public interest today doesn't permit any such extension of a new operation. I say it is contrary to public interest. Now, the purpose for which I have offered these exhibits is to show the conditions which exist today, * * *."

At the conclusion of the rehearing, the commissioner entered an order which reaffirmed his order of November 5; that is, the one which granted a permit to O. N. C. As a part of this order of affirmance, the commissioner stated:

"The Commissioner realizes and appreciates the existing conditions in the motor transportation industry due to the war and the national emergency, and that such conditions are of vital interest to the public requiring transportation. The regulations of the Office of Defense Transportation and other federal bureaus and agencies have and will without question continue to affect the motor carriers in this state during the period of such emergency. However, such regulations do not supersede the jurisdiction of the Public Utilities Commissioner of the State of Oregon as to his determination of applica-

tions for permits under the Motor Transportation Act, and are not binding upon him in reaching his determination under such act. That act clearly sets forth the requirements that applicants must meet to secure permits and compliance with orders of the Office of Defense Transportation and other similar federal regulations cannot be made a condition precedent to the granting of an application, since to do so would result in a surrender of the authority of the Public Utilities Commissioner to federal control and supervision.''

The foregoing will suffice as a review of the record.

Before considering the assignments of error we shall first determine whether the contents of the above-mentioned papers, with the exception of 15, 16, 18 and 20, are before us for consideration. No authority is cited by the appellants indicating that any of them was admissible as evidence, and none of the assignments of error claims that any rule of evidence was violated when the documents were rejected. The papers that set forth rules and regulations were applicable to two groups—(a) truck manufacturers in the production of equipment, and (b) carriers which were operating motor trucks. With some of the rules embraced in the second division, O. N. C., like all other carriers, was compelled to comply. Presumably, O. N. C. was meeting their requirements at the time of the hearing because at that time it was an operating common carrier which was daily running equipment between Portland and Medford. In the event it obtained a permit from the commissioner for the Portland-Ashland schedules, but could not comply with the rules, its permit would avail it nothing.

When this suit came on for trial in the circuit court, the appellants did not offer in evidence the docu-

ments above described which had been rejected by the commissioner. Sections 113-153 and 112-4,121, the material parts of which are duplicates, contemplate that in suits of this character the parties are not confined to the evidence which the commissioner heard, but may go on and offer additional testimony. They also provide that in the event additional evidence is received, "the court, before proceeding to render judgment, unless the parties to such suit stipulate in writing to the contrary, shall transmit a copy of such evidence to the commissioner and shall stay further proceedings. * * *." The procedure thus outlined recognizes the commissioner as the fact-finder, and deems his action as administrative. In other words, the facts in matters of this kind are found, not by the judge, but by the commissioner. The commissioner's findings are binding upon the court, in the event of judicial review, if supported by cogent, competent, material and substantial evidence. But when this suit was pending before the circuit judge, the rejected documents were not reoffered and no ruling upon them was requested. Hence, we are forced to the conclusion that the appellants abandoned the documents and did not wish them to become a part of the record in the judicial proceedings. This is particularly true, since the appellants, through assignment of error, do not contend in this court that the documents were admissible in evidence. Hence, we reach the conclusion that these papers are entitled to no consideration by us.

■■ We take occasion, however, to state our belief that the commissioner properly rejected these documents as irrelevant. The general purport of these sheaves of orders, rules and regulations is that a devastating war is under way, that there is a shortage of

tires, manpower and equipment, and that all carriers must avoid unnecessary operations. But the acquisition of that knowledge is not dependent upon a reading of those papers. Surely any man fit to hold the office of public utilities commissioner must be familiar with the facts recited in these documents. Administrative law is predicated upon a belief that no man is appointed to an office, such as public utilities commissioner, unless he possesses special fitness, and that through the daily performance of his duties he acquires a fund of practical knowledge concerning the problems which he daily faces. His fund of knowledge is properly employed by him in passing upon controverted matters, provided he makes known the facts of which he takes notice. Wigmore on Evidence, 3d ed., § 1805; 42 Am. Jur., § 130; Final Report, Attorney General's Committee on Administrative Procedure, p. 71; and Benjamin, Administrative Adjudication, p. 206.

■ In the present instance, the defendant commissioner could, and should, have taken notice of the war and of the necessity of conserving motor equipment when O. N. C.'s application for a permit was placed in his hands. Upon the original hearing, ten months before the papers were offered in evidence, scores of witnesses had dwelt upon the war situation and the many products handled by carriers which were subject to war priorities. So extensive was that evidence that the appellants' brief devotes two pages to an enumeration of items "entirely eliminated or restricted by war conditions." The pages begin thus: "Tires, batteries." Thus, the evidence taken before the commissioner showed that federal agencies, spurred into action by the shortages, had curtailed the use of tires, batteries, etc., for the purpose of conservation. The commissioner

indicated that he was cognizant of the conditions aris-
ing out of the war, for his findings recite:

> "The Commissioner realizes and appreciates the
> existing conditions in the motor transportation in-
> dustry due to the war and the national emergency,
> and that such conditions are of vital interest to the
> public * * *.''

We think that if the protestants (appellants) felt
that the commissioner was not sufficiently apprised
of the necessity of conserving equipment during the
war period and possessed no proof of necessity, in-
separably linked with immaterial matter, they should
have approached the situation by asking the commis-
sioner to take judicial notice of the commonly recog-
nized facts set forth in these documents, rather than
offer in evidence a couple of hundred pages of printed
material through which the weary eye must pass in
order to glean an occasional fact pertinent to the issues.
As was said in Final Report of the Attorney General's
Committee on Administrative Procedure, "Laborious
proof of what is obvious and notorious is wasteful.''
The Report suggests:

> "It would make for greater expedition and for
> fuller utilization of administrative skills and knowl-
> edge if there were more liberality in respect of
> official notice.''

The suggestion, of course, contemplates that proper
safeguards be employed. We believe that the objection
of irrelevancy was properly sustained.

We shall first consider the assignment of error
which contends that the grant of the permit to O. N. C.
was "contrary to the public interest.'' The words

quoted were taken from § 115-511, subd. (c), O. C. L. A.
The pertinent language of the statute is:

"If the commissioner finds from the record and
the evidence * * * (c) that the operation pro-
posed is not contrary to the public interest; * * *
(h) * * * then the commissioner, upon compli-
ance by the applicant with the law and the rules
and regulations of the commissioner, shall issue a
permit, * * *."

■ First of all, it must be observed that the statute
just quoted does not demand that a challenged order be
supported with a finding that the proposed operation
will serve the public interest. As will be seen by ad-
verting to § 115-504, previously quoted, that section
says:

"Nothing in this act shall be construed as re-
quiring or authorizing a compliance with, or an
application of, any law or rule with respect to a
certificate of public convenience and necessity as a
condition to the granting of any permit."

The finding which our statute requires is nothing more
than one that "the operation proposed is not contrary
to the public interest."

The difference between the requirement exacted by
our law and (1) a demand for a finding that the opera-
tion will serve the public interest and (2) that the
applicant present a certificate of public convenience
and necessity, is one of real substance. The restricted
requirement of our statute preserves freedom of enter-
prise, and subjects the new operation to the veto power
of the commissioner only in the event that the proposed
operation is contrary to the public interest.

The appellants state the assignment of error under
consideration thus:

"The Court erred in failing to hold and decree
that the defendant Commissioner misconstrued the

Motor Transportation Act, particularly as to the meaning of the term 'public interest' as used therein, and assumed and exercised authority not granted therein, * * *.''

They divide the assignment of error into the following propositions:

1. ''A declared legislative purpose embraced in the Motor Transportation Act is that all unnecessary use of public highways by motor carriers be prevented and permits for a proposed new service granted only upon proof of some inadequacy in existing service.''

2. ''The Motor Transportation Act is designed to promote good service at reasonable rates by excluding unnecessary competing carriers.''

3. ''Under the Motor Transportation Act existing carriers are entitled as a matter of right to transport all the traffic which they can handle adequately, economically, and efficiently without the competition of new motor-carrier service.''

4. ''Where existing transportation service is adequate any unnecessary duplication thereof is contrary to the public interest and unlawful.''

5. ''The term Public Interest has been judicially declared not to be an uncertain criterion when the legislative purpose is clearly defined, because it must be interpreted in the light of that legislative purpose.''

In general support of their assignment of error, the appellants cite: *New York Central Securities Corporation v. United States,* 287 U. S. 12, 77 L. Ed. 138, 53 S. Ct. 45; *Texas v. United States,* 292 U. S. 522, 78 L. Ed. 1402, 54 S. Ct. 819; *United States v. Lowden,* 308 U. S. 225, 84 L. Ed. 208, 60 S. Ct. 248; *International Railway Company v. Public Service Commission,* 264 App. Div. 506, 36 N. Y. S. (2d) 125; *Fornarotto v.*

*Board of Public Utility Commissioners of New Jersey,*
105 N. J. L. 28, 143 Atl. 450, 453.

The first three of the above decisions were rendered
under federal statutes which authorized railroad
mergers and consolidations, and the lease by one rail-
road of its properties to another, provided the Inter-
state Commerce Commission lent its approval. In the
New York Central case, the pertinent statute said:

> "Whenever the commission is of opinion, after
> hearing, * * * that the acquisition, to the extent
> indicated by the commission, by one of such carriers
> of the control of any other such carrier or carriers
> either under a lease or * * * will be in the public
> interest, the commission shall have authority by
> order to approve * * *."

The decision sustained the validity of an order of the
Interstate Commerce Commission which authorized the
New York Central Railroad to acquire control through
lease of the properties of the Michigan Central Rail-
road and of the Big Four. The court said:

> "The public interest is served by economy and
> efficiency in operation. * * *
> "Appellant insists that the delegation of author-
> ity to the commission is invalid because the stated
> criterion is uncertain. That criterion is the 'public
> interest'. It is a mistaken assumption that this is
> a mere general reference to public welfare without
> any standard to guide determinations. The purpose
> of the act, the requirements it imposes, and the con-
> text of the provision in question show the contrary.
> * * *
> "The provisions now before us were among the
> additions made by Transportation Act, 1920, and the
> term 'public interest' as thus used is not a concept
> without ascertainable criterion but has direct rela-
> tion to adequacy of transportation service, to its
> essential conditions of economy and efficiency, and

to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred.

\* \* \*

"The question whether the acquisition of control in the case of competing carriers will aid in preventing an injurious waste and in securing more efficient transportation service is thus committed to the judgment of the administrative agency \* \* \*."

In the Texas case, a federal statute provided that if "the proposed consolidation \* \* \* lease \* \* \* or acquisition of control will be in harmony with and in furtherance of the plan for the consolidation of railway properties \* \* \* and will promote the public interest", the Interstate Commerce Commission may approve it. The issue concerned an order of the commission which authorized the Kansas City Southern to acquire control by lease of the Texarkana & Fort Smith. The commission found that the lease would effect savings in expenses through elimination of offices and machine shops at Texarkana. The State of Texas contested the validity of the order and its effect on the ground that, since the lessor railroad was incorporated under the laws of Texas, it was subject to a statute of that state which provided for the maintenance of the railroad's offices and machine shops in Texas. In sustaining the order, the court held:

"We found that Transportation Act, 1920, introduced into the federal legislation a new railroad policy, seeking to insure an adequate transportation service. To attain that end, new rights, new obligations, new machinery, were created. \* \* \* It is a primary aim of that policy to secure the avoidance of waste. That avoidance, as well as the maintenance of service, is viewed as a direct concern of

the public. * * * The criterion to be applied by the Commission in the exercise of its authority to approve such transactions—a criterion reaffirmed by the amendments of Emergency Railroad Transportation Act, 1933—is that of the controlling public interest. And that term as used in the statute is not a mere general reference to public welfare, but, as shown by the context and purpose of the Act, 'has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities.' ''

In *United States v. Lowden,* the third of the cited cases, the controlling statute was the same as in the second case. In the Lowden case, the Interstate Commerce Commission, in approving a lease of the properties of the Chicago, Rock Island & Gulf Company to the Chicago, Rock Island & Pacific, prescribed as a condition that certain employees of the lessor should receive partial compensation for the loss they would suffer by reason of the fact that the lease would result in their discharge or transfer. The decision, in interpreting the phrase "the public interest", quoted from the Texas decision and the New York Central decisions.

It will be observed that in those three cases, unlike ours, the express purpose of the statutes was to authorize the Interstate Commerce Commission to approve mergers, consolidations and the lease by one carrier of its property to another. The term "public interest" was inserted in those acts, not for the purpose of overriding the parts which permitted consolidations, but to enable the Interstate Commerce Commission to disapprove consolidations which were not in the public interest.

In the fourth of the cited decisions (*International Railway Company v. Public Service Commission*), the

court sustained the validity of an order of the Public Service Commission of New York which ordered the International Railway Company (I. R. C.) to cancel a management contract which it had with Mitten Management, Inc. Under the contract, Mitten had complete supervision of the properties of I. R. C. and received large sums in payment for its services. The two concerns were affiliated through some joint officers and stockholders. A New York statute, referring to management contracts, provided that if the commission, after hearing, find "that any such contract is not in the public interest, the commission, after investigation and a hearing, is hereby authorized to disapprove such contract." The decision said:

> "We think it is plain enough that the term 'public interest' is directly related to and limited by the main purposes of the Public Service Law. These purposes, so the legislature has once said, are 'to guarantee to the public safe and adequate service at just and reasonable rates, to the stockholders of public service corporations, a fair return upon their investments, and to bondholders and other creditors, protection against impairment of the security of their loans.' "

Referring to the statute which authorized the commission to pass upon the reasonableness of management contracts, the court said that the end sought

> "was to curtail and prevent unnecessary, improper or excessive expenditures on the part of utilities to affiliated interests * * *. The legislature could hardly have assumed to specify in advance of every situation involving affiliates, details connected with improper and excessive expenditures. * * * The Commission's conclusion that the contract is not in the public interest because it is unnecessary for the proper management of I. R. C. and an unneces-

sary expense, is supported generally by the evidence, and for the reasons to which we have briefly referred."

The Fornarotto decision, being the last one above cited, was based upon a New Jersey statute, which provided:

"No privilege or franchise hereafter granted to any public utility * * * by any political subdivision of this State, shall be valid until approved by said Board, such approval to be given when, after hearing, said Board determines that such privilege or franchise is necessary and proper for the public convenience and properly conserves the public interests."

The trustees of the village of South Orange granted to the prosecutors a franchise for the operation of buses along a route already served by the trolley cars of the Public Service Company. The latter, according to the decision, was "a quasi public corporation and has been organized for many years to practically carry on the work of public transportation as a substitute or a subsidiary for direct public service by the state; * * *." The board of public utility commissioners denied approval of the franchise and thereupon the prosecutors sought judicial review through the medium of certiorari. They contended that, since they proposed transportation for a 5-cent fare, whereas the Public Service Company charged 10 cents, and since many witnesses testified in support of their franchise, whereas the Public Service Company presented only one witness, the board's veto lacked support by evidence. In sustaining the action of the board, the court commented at length upon the careful consideration which the board had bestowed upon the disapproved

franchise. In sustaining the order of the board, the court said:

"This manifestly is a question of good judgment for the board to determine upon the evidence, as well as upon their knowledge of the situation presented by the existing conditions of public travel, and the general public welfare. The Legislature has seen fit to delegate this power to the discretion of this board, and, unless it appears that the board has reached its conclusion by a manifest violation of the law or by a clear abuse of the discretion vested in it, it is not within the power of this court to disturb the conclusion thus reached, where there is evidence apparent upon which it can be reasonably supported.
\* \* \*

"In rendering its decision, the Board of Utility Commissioners considered these matters seriatim, including the need for additional transportation and the public interest generally, which would be subserved by a continuance of the present 5-cent fare system; and the larger question was whether it would be in the public interest under the circumstances related to grant the consent applied for, keeping in mind at all times that, when the Legislature used the words 'the public interest' the intention was to connote not only the local situation, but the general effect of such action upon the entire body politic served by the corporation. It must be manifest that the prime purpose of legislative action of this character is to serve the body politic as an entirety, or, in the language of the act, 'the public interest' as contradistinguished from legislation of a peculiar local character limited only to the necessities of a circumscribed territorial locality, unless the intention be otherwise clearly expressed in the enactment. Such not only is the presumptive legislative purpose, but our constitutional amendments concerning special municipal legislation emphasize such legislative intent. \* \* \*

"The test in a case of this character manifestly is not limited to the rate of fare proposed to be charged, but to those considerations of general public advantage and convenience, which might be disrupted if not entirely disestablished to the public detriment, were the existing status disorganized or discontinued.

"In such a situation, where we find evidence which will support the finding of the board from the various aspects of the case as required by the legislation under which the board is organized, we cannot even upon a mere variance of opinion overturn that position upon a theory based entirely upon a financial status which will affect only the immediate locality in controversy as contradistinguished in the language of the act from the general 'public interest.'"

It pointed out:

"The Public Service Company at present operates its trolleys several miles beyond the limits of the extension sought to be obtained by the bus company, and thereby renders service to a large tract of territory, which service peradventure might be seriously affected, disjointed or materially impaired if the present application were approved."

Under those circumstances, the court held that the prosecutors' offer of a lower fare did not demand a holding that the contested franchise would be in the public interest.

The appellants follow their first proposition above quoted with the following citations: §§ 115-504, 115-506 and 115-511, O. C. L. A., and *Anderson v. Thomas,* 144 Or. 572, 26 P. (2d) 60, and *Warren v. Bean,* 167 Or. 116, 115 P. (2d) 167.

We have already quoted § 115-504, O. C. L. A., in full, and likewise quoted all pertinent parts of § 115-511.

The parts of § 115-506 which are quoted in appellants' brief are:

"The commissioner hereby is vested with power and authority, and it shall be his duty, to supervise and regulate all common carriers of persons or of property, or of both, and * * *

"(e) To regulate operating and time schedules of carriers so as to meet the needs of any community served and so as to prevent unnecessary duplication by common carriers of the transportation services afforded by other common carriers, or by contract carriers; * * *"

The Anderson decision sustained the validity of the very act, Motor Transportation Act, which governs this suit. The only part of that decision which the appellants' brief quotes is the one in which the author of the decision, Mr. Justice BAILEY, stated the purpose of the act:

"The objects sought to be accomplished by the legislature in the enactment of the statute in question in the case at bar are, as contained in its declaration of policy, to conserve and maintain the highways, to render them safer for use by the public, to eliminate discrimination in rates, and to adjust and correlate the various transportation agencies of the state so that the interest of the public may best be served."

In the Warren decision, this court sustained an order of the public utilities commissioner which denied to some applicants a permit to operate as common carriers of property anywhere for hire. The commissioner's findings upon the original hearing stated that there were so many carriers "now operating in the territory proposed to be served by applicants" that they were operating either "at a small profit or loss" and that if additional business were lost to them "it would seri-

ously hamper their ability to serve the public." Upon rehearing, the commissioner entered findings which stated: "Adequate transportation service is now being rendered" in the territory in which the applicant sought entry, and "that the granting of permit applied for, as amended by applicants, will result in the impairment of the ability of existing operators to adequately serve the public. * * * The operation as proposed beyond three miles of the city limits of Medford is contrary to the public interest." Later, upon the presentation of more evidence, the commissioner made additional findings, from which we quote:

"The granting of plaintiffs' application in the territory for which permit is requested will result in the impairment of the ability of the existing operations therein to adequately serve the public, that plaintiffs are not able or adequately equipped to perform the service proposed; that the operation proposed is contrary to the general welfare and public interest; that plaintiffs are not capable of conducting transportation service contemplated in compliance with the law and have been an habitual and an intentional violator of the law, * * *."

The decision of this court held that, since those findings were supported by substantial evidence, the validity of the order must be sustained. In so holding, the decision said:

"Here, there was a fair hearing before the commissioner. There was evidence to support his findings and no violation by him in any respect of the due process clause."

In support of their second proposition above quoted, appellants cite §§ 115-504 and 115-511, O. C. L. A.; *Buck v. Kuykendall,* 267 U. S. 307, 45 S. Ct. 324, 69 L. Ed. 623, 38 A. L. R. 286; *Warren v. Bean,* 167 Or. 116, 115 P. (2d) 167; and *Anderson v. Thomas,* 144 Or.

572, 26 P. (2d) 60. We have already quoted the pertinent parts of §§ 115-504 and 115-511, O. C. L. A., and have reviewed the Warren and Anderson decisions. The Buck decision reversed a decree of the United States District Court which dismissed a bill brought to enjoin the enforcement of a Washington statute which prohibited common carriers from using highways, including those built with federal aid, without first obtaining a certificate of public convenience and necessity from the Washington director of public works. The Washington courts construed their statute as applicable to common carriers engaged in interstate commerce. The plaintiff desired to operate between Seattle and Portland exclusively in interstate commerce. Oregon granted him a license, but Washington denied him one on the ground that adequate transportation facilities were already provided by existing carriers. The decision under review held that state regulations for the promotion of public safety upon the highways and for the conservation of the latter are not obnoxious to the Commerce Clause, but that the Washington statute was not of that kind. The court said:

"Its primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition. It determines, not the manner of use, but the persons by whom the highways may be used. * * * Thus, the provision of the Washington statute is a regulation, not of the use of its own highways but of interstate commerce. Its effect upon such commerce is not merely to burden but to obstruct it."

In support of their third proposition, above quoted, the appellants cite *Application of Megan,* (S. D.), 5 N. W. (2d) 729; *Trescott Transfer Co. v. Sawyer,* 138 S. C. 337, 136 S. E. 481; *Tarbet Extension Application,*

6 M. C. C. 325; *Application of J. W. Dreasher Co.*, 12 M. C. C. 63, 68; *Textile Truckers, Inc.*, 3 Fed. Car. Cas. 30340; *Powell Bros. Truck Lines, Inc.*, 33 M. C. C. 93, 3 Fed. Car. Cas. 30233; *New York Central Railroad Co. v. Public Utilities Commission*, 123 Ohio St. 370, 175 N. E. 596; and *Continental Freight Forwarding Co. v. Public Utilities Commission*, 126 Ohio St. 16, 183 N. E. 790. ·

The Megan case was based upon an order of the public utilities commission of South Dakota which granted the application of the receiver of the Chicago & Northwestern Railway Company to operate as a common carrier of property in South Dakota. A statute of that state required the entry of a finding of public convenience and necessity as a condition precedent to the grant of a permit. The protesting carriers claimed that the commission's finding was arbitrary. Referring to the section of the laws which required the certificate of public convenience and necessity, the decision said:

> "The commission is not clothed with an unlimited discretion. The statutes from which its powers are derived serve also to mark the boundaries of those powers. As we have indicated supra, its power to grant a certificate is conditioned upon proof of the existence of public convenience and necessity for the proposed service. SDC 44.0410. In its common or technical use that phrase is employed with reference to a concept of lesser scope and content than those denominated 'public welfare' and 'public interest.' As ordinarily used, public convenience and necessity has reference to a particular aspect of public welfare or interest. In SDC 44.04 it deals with the public interest in transportation. That chapter was enacted to safeguard the public interest in transportation by regulating a particular kind of common carrier. The end in view, however, was to so adjust particular operations to

the total public need for transportation as to best serve the public interest. It sought to exclude from the highway all those whose operations would not make a real contribution to the efficiency and dependability of the transportation system of the territory or community.''

That is the part of the decision which the appellants quote in their brief. Notwithstanding the fact that the court viewed the statute in that manner, it sustained the order of the commission. It did so because

''There was basis in the circumstances established by the evidence for a rational conclusion that purely incidental movement of l. c. l. freight between stations by truck would not only improve the character of applicant's railroad services to the public, but would also add vitality to a failing indispensable transportation service.''

The Trescott Transfer case was governed by a statute which required those who sought to operate a commercial vehicle upon the highways to obtain from the highway commission a certificate of public convenience and necessity. The applicant in the case under review possessed no certificate and sought a writ of mandamus to compel the issuance of one. The circumstances, which are stated with meagerness in the decision, satisfied the court that there was no necessity for the issuance of the writ.

The Tarbet, Dreasher, Powell and Textile opinions, also cited by the appellants in support of their third above-quoted proposition, were entered by the Interstate Commerce Commission or divisions thereof and were controlled by the Federal Motor Carrier Act, 49 Stat. at Large 543. The part of that act applicable to

common carriers by motor vehicle says that no carrier of that type

"shall engage in any interstate or foreign operation on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the commission authorizing such operations."

The part of the act applicable to contract carriers says:

"Subject to Section 210, a permit shall be issued, * * * if it appears from the applications * * * that the proposed operation, * * * will be consistent with the public interest and the policy declared in section 202(a) of this part."

Section 202(a) says:

"It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; * * *."

In the Textile proceeding a permit was sought in alternative form as a common or contract carrier. In the Powell proceeding the applicant, a common carrier, wished to extend its operations. In the Tarbet and Dreasher proceedings permits were sought as contract carriers. All three applications were rejected. No interpretation of the sections of the act of value to our present purposes is set forth in the orders of the commission. We have failed to find a copy of the Textile decision in the official reports. In the Powell opinion the commission said:

"In fine, applicant would merely add an unneeded service to the total service now available, and

it would do so selectively by handling only the more profitable traffic that moves between the two large traffic centers. This would tend to impair the ability of directly interested carriers to continue their operations profitably and soundly; * * *.''

The New York Central decision sustained an order of the Ohio Public Utilities Commission which denied an application of the railroad for a certificate of convenience and necessity to operate motor trucks between some Ohio cities. Ohio's statutes require those who proposed, after 1923, to engage in the business of motor transportation to first obtain from the public utilities commission a certificate declaring that public convenience and necessity require the operation. The court said:

"In determining whether public convenience and necessity requires such motor transportation service it becomes the duty of the commission to consider whether the public which the applicant proposes to serve has or has not adequate motor transportation service.

"Construing these statutes, this court has frequently held that the granting of an application for such service is not warranted unless it appears that the public necessity and convenience require the proposed service, and, further, that another motor transportation company, if any, holding a certificate of convenience and necessity granted it by the Public Utilities Commission, covering the same route, is not rendering adequate service, and is not able, ready, and willing to provide the additional service, if any, found to be necessary."

The court held that, since the evidence showed that the route along which the railroad desired to operate was receiving adequate service of the kind the railroad proposed to render, the commission properly refused to issue the certificate.

The Continental Freight Forwarding decision sustained an order of the Ohio Public Utilities Commission which denied an application for a certificate of public convenience and necessity to operate a motor transportation line between Cincinnati and Cleveland. The applicant claimed that, since the route which it selected was virgin, the order of the public utilities commission was arbitrary. The court said:

"The protestants are offering substantial service; not perfect, perhaps, but reasonably adequate to the demands. * * * The inadequacy of the present service must be established, else there could be no necessity for additional service. The terms 'convenience' and 'necessity' constitute two distinct conditions, that must be proven to exist by the applicant, by the greater weight of the evidence, before the machinery of the commission is put in motion."

In support of their fourth proposition, previously quoted, the appellants cite §§ 115-504 and 115-511, O. C. L. A.; *Warren v. Bean,* supra; and *George K. Werner Extension,* 9 M. C. C. 267, 1 Fed. Car. Cas. 236. We have already quoted the material parts of the two sections of our laws just cited and have stated the holding in the Warren decision. The Werner opinion denied an application of Werner for a permit to operate as a contract carrier. From the opinion we quote:

"Under the circumstances, it would be futile to grant applicant a permit where there is no definite assurance that any traffic will be tendered to him to haul. The grant of authority to a contract carrier must be predicated on the inadequacy of present transportation facilities. There is no such evidence in this regard."

It will be recalled from the quotations which we made from Federal Motor Carrier Act that a positive finding is required that the proposed operation will serve the public interest.

With the fifth proposition, we are in accord. It is:

"The term 'public interest' has been judicially declared not to be an uncertain criterion when the legislative purpose is clearly defined, because it must be interpreted in the light of that legislative purpose."

We have now stated all of the appellants' contentions under their first assignment of error and have reviewed all of the authorities cited by them in support of those contentions.

We are not authorized to amend the act, either directly or by the oblique course of engrafting upon it interpretations placed upon other statutes which had different purposes and which were couched in language dissimilar to ours. It must be apparent that statutes which require an applicant to obtain a certificate of public convenience and necessity, and other statutes like the paragraph of the Federal Motor Carrier Act applicable to contract carriers, are substantially different from ours. Our statute expressly disavows use of a certificate of public convenience and necessity. Its resort to the public interest is the declaration that monopolies and monopolistic practices are contrary to the public interest, and the requirement that proposed operations shall not be contrary to the public interest. Normally, a difference in language is indicative of a difference in meaning and purpose. Had our legislature intended that an applicant for a permit should secure from some public agency a certificate of public convenience and necessity, it would not have provided

that such a certificate was unnecessary. And had our legislature intended that an applicant for a permit should convince the public utilities commissioner that his proposed operation will serve the public interest, it would have said so. The fact that it did not say the latter, and, far from requiring a certificate of public convenience and necessity, discarded the certificate, deprives the authorities submitted by the appellants of most of their value.

■ As the foregoing decisions indicate, a statute which requires a new carrier to obtain a certificate of public convenience and necessity demands that the new carrier show that there exists a definite need for the service which it proposes to render. The difference in the demands made by our statute, which authorizes the institution of a new operation if it "is not contrary to the public interest," and other statutes which do not permit the institution of a service unless it will serve the public interest, is self-evident. The commissioner can demand of an applicant nothing unmentioned in the statute which confers his authority.

■ Many terms are chameleon-like; they take on or lose color from their surroundings; in fact, the context, rather than the dictionary, often determines the meaning of a term. In seeking the meaning of "the public interest" as it is employed in § 115-511, O.C.L.A., we find valuable aid in § 115-504, which is an important part of the context of the term "public interest." Section 115-504, which we have already quoted, twice employs that term. By reverting to the quotation, it will be seen that that section says:

"It is contrary to public policy and public interest that monopoly or monopolistic practices in motor transportation be permitted."

The term "monopolistic practices", unless we are mistaken, has reference to the situation which exists when the only business concerns in a given industry act so closely in unison that there is no competition between them. The alternative to monopoly and monopolistic practices is competition. In our opinion, the quoted language is merely another way of stating that public interest demands competition. Our statute, instead of favoring regulated monopoly, is intended, we think, to achieve regulated competition. One can readily understand why a legislative body might favor regulated monopoly in such industries as those of providing water or telephone service for a community, and yet desire competition in the operation of commercial vehicles upon the public highways. In proportion to revenue received, the investment in the plant of a telephone or water company is much greater than the investment in the equipment which a carrier operates upon the public highway. Moreover, the plant of a water or telephone company is fixed to the ground and immovable. A grant of a monopoly is not necessary to attract capital to highway transportation.

The purposes and policies of our Motor Transportation Act, as already indicated, are declared in § 115-504, a part of which we analyzed in the last paragraph. The remaining parts express the need for regulation so that there may be gained for the public: (1) safety in the use of the highways; (2) a minimizing of wear of the road-bed; (3) a curtailment of inconvenience of all users of the highway; (4) a safeguarding of the roadway from improper and unnecessary use; (5) a prevention of the use of the highways by irresponsible persons and those who threaten the public safety; (6) an avoidance of needless traffic congestion, stoppages and hindrances;

(7) a correlation of the transportation agencies so that the highways may serve the public interest; and (9) a method of assessing privilege taxes to provide funds for the construction and preservation of the highways. Section 115-504, after setting forth the above, says:

"The legislature hereby declares that to effect the foregoing ends and purposes this statute is adopted."

Then comes the sentence which abrogates the use of the certificate of public convenience and necessity.

Since the act carefully enumerates its policies, purposes and standards, we think that the authority conferred by § 115-511 upon the commissioner to reject applications which propose operations "contrary to the public interest" is kept in close leash to those policies, purposes and standards. The commissioner, we believe, is authorized to deny a permit only in the event that an applicant wishes to engage in an operation in violation of the purposes, policies or standards set forth in the act. The act, which is the sole source of the commissioner's authority, confers upon him no personal discretion, and an applicant who proposes to engage in an operation which will conform to the act must be granted a permit.

As already indicated, the statute favors regulated competition. Regulated competition is obviously intended to bring about adequate, efficient transportation. In order to be efficient, transportation must be economical and free from unnecessary expenditures. In *Warren v. Thomas,* supra, we sustained the commissioner in denying an application for an unnecessary duplication of transportation facilities. The rejection of such applications tends to gain for carriers a sound

financial condition, and a condition of that kind is in the public interest. But even statutes which require an applicant to secure a certificate of public convenience and necessity are not intended to protect present operators from the competition of others who apply for entry into the industry: *Federal Communications Commission v. Sanders Bros. Radio Station*, 309 U. S. 470, 84 L. Ed. 869, 60 S. Ct. 693.

■ *In Alko Express Lines v. Pennsylvania Public Utilities Commission*, 152 Pa. Super. 27, 30 Atl. (2d) 440, the court said:

> "To what extent there should be competition among intrastate common carriers is primarily a matter of policy which the legislature has committed to the sound discretion and judgment of the commission, and its decision will not be disturbed by the court unless it is so capricious, arbitrary, or unreasonable as to amount to an error of law." (cites authorities)

A commissioner, acting in the public interest, may properly take into account the fact that the goading effect of competition will yield improvements in service that are beyond his power to get for the public through the entry of orders. But, although "society flourishes by the antagonism of its atoms," competition can run into excesses and ruin an enterprise. Since the commissioner is authorized by § 115-511 to reject applications which propose services "contrary to the public interest," or which will "result in the impairment of the ability of existing operators to adequately serve the public," and by § 115-515 to cancel permits if the operation is "against the public interest or unduly congests the highway," he possesses authority to keep competition under control, and should do so.

■ It will be recalled that the appellants' third proposition submits that under our Motor Transportation Act existing carriers are entitled to transport without the competition of a new carrier all the tonnage which they can handle adequately, economically and efficiently. We do not believe that the authorities cited by the appellants warrant the suggested interpretation. It is true that acts which employ a certificate of public convenience and necessity have been construed under favorable circumstances as permitting present carriers to enjoy all the traffic they are capable of handling without being subjected to the competition of an additional carrier; but it will be recalled that one of the appellants' citations is Application of Megan, which we reviewed at length. Although that case was governed by a statute which required a certificate of public convenience and necessity, and although the existing carriers presented the same contention as that made by the appellants, the order which granted a permit to the applicant (receiver for the Chicago & Northwestern Railway) to operate a line of motor trucks was sustained. The obvious purpose was to enable the railroad to compete successfully with the motor carriers. Our statute goes no further in its regard for existing carriers than to require the denial of an application if it proposes an operation which will be contrary to the public interest or one which will impair the ability of existing carriers to serve the public adequately. The appellants urge that the clause concerning the public interest should be construed as meaning that the existing carriers are entitled to all of the tonnage without the competition of a new carrier, provided they can handle it, and argue that the commissioner in the past has employed that construction of the act. We have

examined the orders made by the commissioner upon which the appellants rely, and which declare:

> "Existing transportation facilities in the territory here proposed to be served are adequate * * *. In order to foster sound economic conditions in the motor carrier industry the existing operators normally should be accorded the right to transport all traffic which they can handle adequately, efficiently and economically * * * subject, of course, to the paramount interest of the public."

In view of the guarded language employed by the commissioner in those orders, we cannot say that the appellants submitted a contemporaneous, administrative interpretation of the act which sustains their contention.

Since our act (a) rejects the use of the certificate of public convenience and necessity; (b) makes a positive declaration against monopolies and monopolistic practices; and (c) protects existing carriers against the entry of a new one, if the new carrier will impair the capacity of the existing ones, we do not think that we would be justified in holding that the clause concerning the public interest was intended to yield to the present carriers all of the traffic, provided they can handle it efficiently.

The interpretation of our act urged by the appellants, with the exception of their belief that existing carriers are entitled to all of the available business if capable of handling it, we believe is not materially different from the construction we announced in preceding paragraphs. The appellants argue, however, that the respondent commissioner, in allowing the contested application, employed the - more - the - merrier theory. We know of no basis for that contention. We construe his findings as meaning that (1) the service

into Ashland is inadequate; (2) the volume of business between Portland and Ashland materially increased since 1941; (3) O. N. C., upon being granted a permit, will render service that is needed; (4) O. N. C.'s schedules will receive the patronage of shippers and consignees; (5) O. N. C.'s entry upon the route will not impair the ability of other carriers to render adequate service; and (6) O. N. C. will provide desirable competition to the existing carriers causing them ''to operate more efficiently and provide a better and improved service to the public.'' We find nothing in those basic facts or in any other part of the findings capable of warranting a belief that the-more-the-merrier theory was embraced by the commissioner.

The above being our construction of the act, we shall now determine whether or not the findings entered by the commissioner sustain the attacked order. In the preceding paragraph we epitomized part of the findings. We believe that other parts indicate that the commissioner, in determining whether or not the proposed operation would be contrary to the public interest, did not overlook the war situation and the necessity for conserving tires, gasoline, manpower and motor equipment. For instance, his findings state:

''No appreciable increase in overhead expense, terminal expense or other extraordinary capital outlays will be necessary to institute the proposed service. * * * Applicant also has 3 pickup and delivery trucks that are not being used * * *. Certain of Applicant's equipment operating from the San Francisco Bay area to Medford is idle in Medford for periods ranging from 12 to 36 hours prior to each return southbound trip. Some of this equipment could be used by Applicant in the proposed service, * * *. Applicant leases to Oregon Ex-

press between 5 and 7 pieces of equipment daily. Lessee operates these vehicles between Medford and Portland. If necessary, part of this equipment could be used by Applicant for the service here proposed. * * * It can certainly be said that the federal regulations referred to by Protestants do not prevent, but on the contrary encourage, the interchanging and leasing of equipment. * * * Applicant is adequately equipped to perform the service proposed. * * * Applicant is presently authorized to operate equipment over the routes requested by the instant application and certain limited service is being performed over these routes. * * * The Commissioner realizes and appreciates the existing conditions in the motor transportation industry due to the war and national emergency, and that such conditions are of vital interest to the public * * *.''

These findings clearly indicate that the commissioner took into consideration the necessity for preserving motor transportation equipment. As will be seen from his findings, he found that O. N. C., upon being authorized to institute the proposed schedules, would not have to purchase any new equipment and that a permit would enable it to make better use of its facilities.

█ We regret that the findings of fact, in some details, are not stated with positiveness. Here and there they partake of the nature of a recital of the evidence. The commissioner's finding that ''the operation proposed by the applicant as herein authorized is not contrary to the public interest'' is not a finding of fact; it is a statement of the ultimate conclusion and is couched in the words of the statute; it amounts to nothing more than a statement, ''I followed the law.'' If it stood alone it would afford no one an opportunity to check on the verity of the statement. A finding of fact normally cannot consist solely of statutory language. It

ought to set forth the basic facts, and in doing so should employ, if we may borrow a term from the rules of pleading, plain and concise language. A finding should be a portrayal of the basic facts that have been established in the belief of the trier by the evidence. They should be set forth in such a manner that a court may deduce from them the ultimate facts upon which the statutory criterion will operate. Vom Baur, Federal Administrative Law, § § 564-574. When stated in that manner, they afford all an opportunity to determine whether the administrative agent was faithful to the evidence and whether his order is such as the facts and the law permit.

We think that the commissioner, in addition to employing the facts above indicated as a predicate for his attacked order, also subscribed to a belief that since O. N. C. was already operating trucks between Portland and Ashland, it ought to be permitted to institute the schedules which it submitted. Seemingly, he thought it would serve the interests of economy to permit O. N. C. to operate its own equipment northbound instead of turning it over to the Oregon Express and to place lading in the southbound equipment instead of running it empty. If his findings in regard to those matters were complete, we could readily concur in them, but the findings concerning those features of the application are scant. We believe, however, that the findings can be deemed sufficient concerning the facts set forth in numerical order in a previous paragraph, and that those facts justify the commissioner's conclusion that "the operation proposed by the Applicant as herein authorized is not contrary to the public interest." All of the findings are supported by cogent, competent, substantial evidence. We add that they are not attacked as insufficient in form.

The second assignment of error follows:

"The Court erred in failing to hold and decree that the defendant Commissioner exceeded his statutory authority in granting the permit applied for by intervenor defendant, notwithstanding the admitted impairment to an existing carrier, upon the theory that the benefits of promised improvements in service outweigh such resulting impairment."

By the term "existing carrier" the appellants refer to Independent Truck Line which operates between Medford and Ashland.

The contention embraced in the assignment of error is based upon the following finding made by the commissioner:

"The benefits accruing to the shipping public at Ashland by the institution of the operation here proposed by Applicant would more than offset any diversion of revenues and the consequent lessening of service rendered by Independent."

The finding just quoted is preceded by the following:

"The present service now being provided to shippers and consignees of freight at Ashland, Oregon, is not adequate."

Immediately following the finding first quoted is the following:

"The granting of this application in part and issuance of permit as hereinafter set forth will not result in the impairment of the ability of existing operators to adequately serve the public."

The part of our statute applicable to this contention directs the commissioner to grant a requested permit if he finds "that the granting of the permit will not result in the impairment of the ability of existing operators to adequately serve the public." (§ 115-511)

The finding needed to deny the application was not made.

■ In most instances, a new entrant will divert some tonnage and revenue from existing carriers, but our statute affords no protection against such a contingency unless the diversion will be so great that it will impair the ability of existing operators to serve the public adequately. The protection promised by the statute is primarily for the public, and its aim is to preserve good service. The statutory provision assumes that the present carriers are serving the public adequately, but, as we saw from the finding above quoted, Independent's service to Ashland "is not adequate." We cannot say that O. N. C.'s entry into the Ashland service will reduce Independent's revenue to an insufficient amount. We observe that one of the findings says:

> "Subsequent to the hearing herein, this carrier, along with all other common and contract carriers, were authorized to increase their rates and charges applicable to both intrastate and interstate traffic in an amount approximating 6 per cent, and these increases have been made effective."

Under the circumstances, we cannot say that the commissioner's finding that a grant of a permit to O. N. C. will not impair the ability of existing carriers to adequately serve the public lacks support by competent, substantial evidence. *Warren v. Bean,* supra, upon which the appellants rely, in our opinion, dealt with facts and findings substantially different from those now before us. We conclude that the finding which says that a grant of a permit to O. N. C. will not impair the "ability of existing operators" is binding upon us. Hence, this assignment of error lacks merit.

 The third assignment of error follows:

"The Court erred in failing to hold and decree that the defendant Commissioner, in determining questions of impairment of certain existing carriers, failed and refused to consider evidence of traffic or revenue during normal periods of operation and acted wholly upon the abnormal and unreliable statistics of a single wartime year, and that the findings and conclusions of the Commissioner thereon, reversing his own contrary findings, based on normal operations, are arbitrary, capricious, unreasonable and void."

It will be observed that that assignment of error employs as a part of its predicate purported findings made by the defendant commissioner upon a previous hearing. At the beginning of this opinion we said that the application which eventually authorized O. N. C. to institute the Portland-Ashland schedules, was supplementary to one previously filed. The original application sought, not only a permit for a Portland-Medford service, but also one for schedules into the Coos Bay area. Upon the original hearing, so the appellants say, O. N. C. was authorized to inaugurate only the Coos Bay service. Later came the supplementary application which yielded the order now under attack. According to the appellants' brief, the commissioner entered an order January 23, 1941, in which he made some findings as to Pierce's revenues for the years from 1935 to 1940 and denied O. N. C.'s application for the permit to institute service between Portland and Medford. The brief contains quotations from that purported order, but neither the order nor the evidence upon which it was based is any part of the record before us. We are compelled, therefore, to hold that nothing contained in the purported order can be considered by us. We have already reviewed all of

the evidence which is a part of the record. It indicates that the volume of business along Highway 99 has increased over a considerable period of time and that there is a reasonable likelihood of the increased volume continuing into the foreseeable future. The evidence discloses that at the close of the war there will be a large flow of goods, the manufacture of which was stopped or curtailed by the War Production Board when the war began. Two pages of appellants' brief are consumed with an enumeration of those goods. The unsatisfied demand for them, together with the accumulated purchasing power of the people, will cause a heavy flow of tonnage between Portland and Southern Oregon, according to the beliefs of many who testified at the hearings. Data submitted by Pierce, and reviewed in preceding paragraphs, shows that that carrier has earned sizeable profits and that its volume of business will have to shrink substantially in order to reduce its profits to something like 10 or 12 per cent. There is good reason for believing that Southern Pacific Company and Pacific Motor Trucking Company will not suffer materially from O. N. C.'s entry into the territory. Witnesses also testified that since Consolidated receives its patronage largely because of its nationwide service, it will lose but little business to O. N. C. The findings indicate that the commissioner took all of these matters into consideration, and that the attacked order is not based solely upon abnormal or wartime conditions. What should be deemed normalcy, and when that status will be resumed, are administrative issues, not judicial. The record shows, in our opinion, that the commissioner did not act arbitrarily nor capriciously. We think that the following authorities support our belief: *Alko Express Lines v. Pennsylvania Public Utilities Commission,* supra; *State v. Pub-*

*lic Service Commission,* (Mo. App.), 179 S. W. (2d) 123; *Kansas City & Leavenworth Transportation Co. v. United States,* 51 Fed. Sup. 916. We are satisfied that this assignment of error lacks merit.

The last assignment of error follows:

"The Court erred in failing to hold and decree that the refusal of the defendant Commissioner to receive and consider competent, relevant and material evidence offered by plaintiffs was unreasonable, arbitrary and capricious, denied the plaintiffs a full and fair hearing, and rendered his findings, conclusions and order, and the permit based thereon, unlawful and void."

That assignment of error is based upon the rulings which rejected as evidence the 33 documents offered by the appellants during the rehearing which got under way December 4, 1942. We have already held that since those documents were not reoffered when this suit was tried in the circuit court, nothing pertaining to them is before us. It follows that, in our opinion, this assignment of error lacks merit.

The above disposes of every contention advanced by the appellants. We have not discussed every authority cited by them, but all of them, including *Pierce Auto Freight Lines v. United States,* 57 Fed. Sup. 192, cited during oral argument, have received careful consideration. It is our belief that the attacked decree is free from error. It will be affirmed. In view of the importance of the issues presented by this appeal, we believe that all parties should bear their own costs and disbursements. Therefore, the decree will allow none to any of the parties.